DANIEL G. BOGDEN
United States Attorney
STEVEN W. MYHRE
NICHOLAS D. DICKINSON
Assistant United States Attorneys
NADIA J. AHMED
ERIN M. CREEGAN
Special Assistant United States Attorneys
333 Las Vegas Blvd. South, Suite 5000
Las Vegas, Nevada  89101
PHONE: (702) 388-6336
FAX: (702) 388-6698

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | **2:16-CR-00046-GMN-PAL** |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **GOVERNMENT'S MEMORANDUM IN** |
| | ) | **SUPPORT OF PRETRIAL** |
| MICAH L. McGUIRE, | ) | **DETENTION** |
| | ) | |
| Defendant. | ) | |
| | ) | |

The United States, by and through undersigned counsel, respectfully submits this Memorandum in Support of its Motion for Pretrial Detention pursuant to The Bail Reform Act, Title 18, United States Code, Section 3142.  As explained herein, the government seeks the continued pretrial detention of defendant Micah McGuire ("McGuire") both as a risk of non-appearance and as a danger to the safety of others and the community.

McGuire was a gunman in an unprecedented and extremely violent and massive armed assault on federal officers that occurred on April 12, 2014, while those officers were performing their duties as part of a court-ordered cattle impoundment operation.  But for the courageous restraint of the victim officers

that enabled them to back away from their assaulters and abandon the cattle, the actions of McGuire and his co-conspirators would have resulted in catastrophic death or injury to the officers and/or others.  The fact that no one was shot, however, does not mitigate either the level of violence used that day or the intent behind it.

McGuire was there because he answered a "call-to-arms" from his co-defendant, Cliven Bundy, to come to Nevada to forcibly stop federal law enforcement officers from the executing court orders to impound his cattle.  In response to the call, McGuire knowingly traveled from Arizona to Nevada with firearms and ammunition and the intent to use them against those law enforcement officers.

McGuire is currently charged with crimes of violence including using and brandishing firearms in connection with crimes of violence under Title 18, United States Code, Section 924(c).  As such, the Bail Reform Act presumes that there are no conditions or combination of conditions that will ensure the safety of the community.  Here, no evidence has been adduced during the investigation of the instant charges that offers a rebuttal to that presumption.

## I.    INTRODUCTION

McGuire was indicted by a federal grand jury sitting in the District of Nevada on March 2, 2016. He was charged with conspiracy to commit an offense against the United States, in violation of 18 U.S.C. § 371, conspiracy to injure or impede a federal officer, in violation of 18 U.S.C. § 372, assault on a federal officer, in violation of 18 U.S.C. § 111, threatening a federal law enforcement officer, in

violation of 18 U.S.C. § 115, obstruction of justice, in violation of 18 U.S.C. § 1503, interference with interstate commerce by extortion, in violation of 18 U.S.C. § 1951, and four counts  of using or carrying a firearm in relation to a crime of violence, in violation of 18 U.S.C. § 924(c). Based on the evidence adduced from its investigation to date, the government proffers the following in support of its motion for pretrial detention:

### A.   Background.

McGuire is a 31 year old Army veteran residing with his family in Arizona.

Cliven Bundy is a long-time resident of Bunkerville, Nevada, living on 160 acres of land in a very rural and sparsely-populated area of the state. Bundy Ranch, as he refers to the property, is located near the Virgin River a few miles from where Interstate 15 crosses from Nevada into Arizona, approximately 90 miles northeast of Las Vegas, Nevada.  Bundy Ranch is surrounded by hundreds of thousands of acres of federal public lands commonly referred to as the Gold Butte area or the Bunkerville Allotment.  Bundy uses that entire range of land to graze his cattle unlawfully.

Bundy claims he has strong anti-federal government views, proclaiming that the federal government cannot own land under the U.S. Constitution.  These are not principled views – and certainly they have no merit legally – but nonetheless serve conveniently as a way for Bundy to somehow try to convince others that he has some reason for acting lawlessly, other than the obvious one: it serves his own ends and benefits him financially.  Untethering himself from the law, Bundy claims he can do with his cattle as he pleases, including not incurring

the expenses to manage or control them and not paying for the forage they consume at the expense of federal taxpayers.

Federal law requires any rancher to pay fees and obtain grazing permits to run cattle on public lands.  The evidence suggests that before 1993, Bundy paid fees and kept current the permit his father before him had acquired for grazing cattle on the Bunkerville Allotment. In 1993, however, when BLM restricted both the number of head he could graze and the seasons during which he could graze them, Bundy was faced with the prospect of having to control his herd and bring them off the land during the off-season.  It was then that Bundy claimed that he supposedly "fired the BLM" and refused, from then until to the present, to pay any grazing fees or submit to permits.

It appears that Bundy made some attempt to fight the 1993 restrictions administratively but to no avail.  But despite losing, he continued in his scofflaw ways, ignoring BLM regulations and restrictions pertaining to his use of the public lands, allowing his cattle to run wild and refusing to pay for the forage he leached off the taxpayers.

Ultimately, the BLM sued him in 1998 for trespass, the case being filed in the United States District Court for the District of Nevada before then-United States District Judge Johnny Rawlinson. Bundy lost the case and Judge Rawlinson issued an order requiring Bundy to remove his cattle permanently from the Bunkerville Allotment (hereinafter "the 1998 Order").  Making the same failed claims he continues to make to this day – the federal government cannot own the land – Bundy appealed the 1998 Order to the Ninth Circuit but lost there also.

Undeterred, Bundy simply ignored the 1998 Order, running his cattle as he always had, violating the 1998 Order just as he had all the other rules and regulations governing public lands. In 1999, Judge Rawlinson issued another order, re-affirming the 1998 Order and fining Bundy for each day he refused to remove his cattle. He ignored that Order just as he had the previous one.

Thereafter, other attempts were made to remove or have Bundy remove his cattle, all to no avail. The BLM went back to Court in 2012, filing a new lawsuit against Bundy to remove his cattle from the LMNRA and also filing a motion to renew the 1998 Order pertaining to the Bunkerville Allotment.

United States District Judge Lloyd George presided over the 2012 action. As he had before, Bundy claimed that the federal government could not own the land. However, in keeping with well-established legal precedent, Judge George – like every other previous court – rejected Bundy's claims in a July 2013 Order and required Bundy to permanently remove his cattle from the LMNRA within 45 days.

The motion in the 1998 action went before United States District Judge Larry Hicks. Like Judge George, Judge Hicks rejected Bundy's claims in an October 2013 Order, re-affirming the 1998 Order and requiring Bundy to remove his cattle from the Bunkerville Allotment within 45 days. The Orders from Judge George and Judge Hicks each authorized the BLM to remove and impound the cattle if Bundy refused to do so, Judge Hicks expressly ordering Bundy not to physically interfere with any seizure or impoundment operation conducted by the BLM.

As before, Bundy refused to remove his cattle.  Thus, the 2013 Orders in hand, the BLM planned for and commenced impoundment operations beginning around April 5, 2014.

**B.      The April 12, 2014, Armed Assault**.

On April 12 and for the purpose of thwarting the impoundment, Bundy organized and led over 400 Followers to assault the BLM officers as they guarded the Impoundment Site, all for the purpose of getting his cattle back.   The Superseding Indictment sets out the nature of the assault that day as well as many of the threats and acts of violence that led up to the assault, which started even before the impoundment operation began.  While the government does not intend to repeat those allegations here, it incorporates them by reference and proffers the following.

- **The April 12 assault was an extremely violent act.**

As the Court knows, it is a violation of federal law to use a firearm to assault, interfere with or intimidate a federal law enforcement officer.   And contrary to the fiction recited by Bundy and his Followers to others, there is no First or Second Amendment right or other right recognized in the law anywhere that gives anyone the right to use or carry, let alone brandish, raise or point, a firearm in order to assault, intimidate, interfere with or prevent a federal law enforcement officer from performing his or her duties – whether one thinks the officer is acting constitutionally or not.  While that should be obvious to any law

abiding citizen, Bundy and his co-conspirators, including McGuire, espouse and act to the contrary.

On April 12, Bundy had mustered more than 60 firearms to assault and intimidate federal law enforcement officers while they were performing their duties. The evidence shows that officers confronted an angry mob of more than 270 people directly in front of them, the mob being backed up by gunmen brandishing or carrying rifles and firearms among the unarmed Followers, or perched on high ground in over-watch positions, or in concealed sniper positions aiming their assault rifles from bridges.  The officers guarding the gate that day, almost to a person, thought either they, or unarmed civilians in front of them, or both, were going to be killed or wounded.  Many of these officers, some of them combat veterans, remain profoundly affected emotionally by this event to this day. Witnesses have described the level of violence as so intense that something as innocent as the backfire of vehicle, or someone lighting a firecracker, would have set off a firefight between the gunmen and the law enforcement officers.

The Superseding Indictment alleges and the investigation shows that Bundy was responsible for recruiting the gunmen, including McGuire, to come to Nevada to confront the BLM.  He and his co-conspirators did so by issuing numerous calls to arms, inciting and soliciting others to bring weapons to Bundy Ranch, to show force, to make the BLM back down, to surrender, and other similar exhortations.  The justification, according to Bundy and his followers:  BLM was acting unconstitutionally in impounding his cattle.  In other words, BLM was enforcing the law and Bundy didn't like it – so he organized an armed assault.

- **Bundy, his co-conspirators and Followers have pledged to do it again.**

The evidence shows that this was an unprecedented act.  The gunmen traveled great distances in a short period of time, answering Bundy's call to arms, coming from more than ten states to get to Bundy Ranch to confront the BLM, flooding into the Ranch between April 10 and the morning of April 12.  The evidence shows that when the gunmen arrived, the conspirators organized them into camps, armed patrols, and security check points.

The evidence shows that Bundy rallied and directed his Followers to get his cattle out of the impoundment site on the morning of April 12. Bundy's son, Ammon, led the assault on one of the entrances to the site.  Indicative of his intent that day was his statement to another person as he was drove his truck to the impoundment site:  "These federal agencies have a lot of power and they are not just going to give that power up.  The people just have to take it, I guess."

In the immediate aftermath of the assault and extortion, after having delivered the extortionate demands to the SAC and coercing the officers into leaving by threatening violence, Ammon Bundy was asked whether BLM was gone for good.  Ammon responded:  "They better be or the people will do it again."

In an interview later in the evening on April 12, Ammon Bundy stated:

We the people expressed our power and as a result the Sheriff took control of his county.  The Sheriff must protect the agency of man.  The people have the power -- it's designed that way -- you have the people and then you have the Sheriff.  Sovereign citizens on our own land.

Many of these same gunmen who conspired with Bundy and his son to assault the impoundment remain at large and, through Facebook posting and

other social media outlets, have pledged to support Bundy again if BLM takes any action against him. The co-conspirators believe in challenging the lawful consequences of their actions by force.

**C.   Post-Assault:  April 13 and thereafter.**

Immediately after the assault, Bundy and his co-conspirators openly celebrated their victory, at gun point, against the federal government. In an interview posted to the Pete Santilli Show's YouTube channel on or about April 16, 2014, Cliven Bundy was interviewed by an individual named Peter Rense. When asked whether the BLM still had officers in the area, Bundy stated, "We the people and the militia definitely rid this place of any of that kind of influence." *See* https://www.youtube.com/watch?v=dI-3qYTMGgU (last visited February 11, 2016). In the same interview, Bundy expressed dismay that the BLM was allowed to leave with their weapons on April 12: "we haven't won the war, we've just won one chapter of it." *Id.* Bundy's characterization of the assault as part of a larger "war" makes clear that his efforts to thwart and interfere with BLM law enforcement officers would carry on.

To that end, Bundy relied on armed individuals who continued to travel to Bundy Ranch in the months after the assault. These individuals were camping in and around what the Bundys designated as "militia camps," engaged in reconnaissance missions, manned check points on public roads, and conducted armed patrols of the area around Bundy Ranch to ensure BLM officers were not present and would not return. Bundy and his conspirators established a firing

range on public land which his lead bodyguard used to train other gunmen to protect Bundy and his ill-gotten gains.

On April 17, 2014, local Channel 8 news reported on the continued armed presence in the area and stated that "Armed protesters continue to surround the Bundy ranch and are even blocking a county road. Some of the supporters attempted Thursday to keep a Channel 8 news crew from entering the area, despite it being a public road. . . . The armed men say they'll be at the site for weeks to come to defend the Bundy family." The news segment included footage of a Bundy guard blocking access to a public road.

Organized patrols of the public lands continued all through the summer into the fall of 2014.  Additionally, evidence shows that telephone lines with roster information were set up, donation pages on the internet continued to be utilized to solicit funds, and gunmen traveled back and forth from other states to do duty at the Ranch.  The purpose of these missions was to ensure Cliven Bundy was not arrested and that BLM did not return to the public lands either to impound the cattle or for any other purpose.

### D.    McGuire's Role in the Conspiracy.

McGuire participated in the conspiracy as a gunman, serving initially as an armed guard for Cliven Bundy, including while he issued the command to the Followers to retrieve the cattle by force from the wash. After Bundy issued this command, McGuire and his co-conspirators rushed with other gunmen to the wash, McGuire taking a sidearm. McGuire and his co-conspirators took tactical

positions on high ground with firearms, dressed in military-style tactical gear, facing in the direction of the federal law enforcement officers.

McGuire's participation in the conspiracy and the armed assault is well-documented in numerous videos and photographs. He is depicted providing personal security to the Staging area from which Cliven Bundy issued his ultimatum to Sheriff Gillespie to disarm the BLM and bring their firearms to the Staging Area, as well as to knock down tollbooths to federal parks. He stood in front of the stage with a sidearm, deterring any law enforcement action.



1B279 "0013L7" @ 01:30.  Woods                    can be seen wearing sidearms. Video begins at 9:36:51, so this screen grab occurred at 9:38:21 and was taken at the Protest Staging Site.



1B254 2014-04-12 11_49_37 @ 00:02:44
10:52:21 @ Protest Staging Site

Photographs and video show that McGuire was clearly armed.



1B279 "0008SO" @ 00:08.  Video taken the morning of 04/12/2014 at the Protest Staging Site.



1B254 2014-04-12 11_49_37 @ 00:03:22
10:52:59 @ Protest Staging Site

Immediately after the Sheriff's allotted time to disarm federal law enforcement officers at the Impoundment Site and otherwise accede to Cliven Bundy's demands expired, Cliven Bundy ordered his Followers to travel to the Impoundment Site and get his cattle back. McGuire followed the command, immediately traveling to the wash with a number of other gunmen who had been with him guarding the stage.



1B254 2014-04-12 11_55_41 @ 00:00:43 – Note that over the next several seconds, several of the militia begin departing, prior to Cliven's announcement.  Once Bundy begins speaking, he provides specific instructions on closing the interstate bridge, the movement of the horsemen, etc., as though these steps have been planned.
10:56:24 @ Protest Staging Site

1B279 "0049DZ" @ 00:08. Video begins at 11:25:40, so this screen grab occurred at 11:25:48 and was taken at the entrance to the protestor parking area south of I-15 NB west of the wash.

Once at the Impoundment Site and in the wash, McGuire and the other gunmen supported the skirmish line that formed in the wash opposite from a gate guarded by armed law enforcement officers, the skirmish line being comprised of about 200 armed and unarmed Followers and about 40 Followers on horseback.



Despite repeated commands from the officers to disperse, including warnings that the Followers were violating federal court orders, McGuire and his conspirators took elevated positions overlooking the officers guarding the gate. The officers observing the gunmen in these positions, felt their lives were threatened by their presence, the gunmen's over-watch position posing a serious threat of harm due to their tactical superiority. As described in the Superseding Indictment, the officers in the wash were dangerously exposed, being on low ground beneath bridges and in position that exposed them to fire from high ground on the sides of the wash or from the bridges.

At the same time McGuire and other gunmen took elevated positions – as observed by the officers and as depicted, in part, by video and photographic evidence – other gunmen moved in and out of the skirmish line, while still others took positions on bridges either openly brandishing assault rifles in front of the officers or taking sniper positions concealed behind concrete barriers lining the bridges.



1B8 QLV_22, Video 00005 @ 04:30.  True time is 12:06:27.  Location is underneath the east side of the I-15 SB overpass.  This is the first time in the Shalaikis video where a long gun is visible under the overpass.

16



1A53 – 20140412_121024.  After synching with the Flynn videos, true time is approximately 12:08:35, location is the wash between the I-15 NB and SB overpasses.

McGuire and other gunmen took heightened and tactically superior positions with their firearms, creating a threat and a great deal of fear in the law enforcement officers in the wash below, who were seeing not only these gunmen tucked up in defended positions under the skirts of the bridge above, but also in the wash and in snipers positions on the bridges themselves. At one point, a BLM Special Agent observed a long gun aimed at the officers from the position where McGuire had taken a tactically superior position.

McGuire, working in concert with the Followers in the skirmish line and with the other gunmen in the wash, on the bridges, or on high ground, created an array of force and violence that was intended to, and did, threated the lives of officers in the event they took any law enforcement action against the Followers who were there to get Bundy's cattle. To prevent injury or the loss of life, the

officers backed down from the gunmen and other Followers in the wash and the cattle were released to Bundy and his co-conspirators.



1B254 2014-04-12 13_44_42 @ 00:02:09.  12:46:51 @ the east skirt of the I-15 SB overpass

After the BLM was forced to abandon the Impoundment Site, McGuire and other members of the Arizona State Militia who were guarding Cliven Bundy on stage were photographed at a closer range, one, co-defendant Jason Woods, was still armed with an assault rifle.



1B279 "0086A7" @ 00:05. Video taken sometime between 12:43 and 12:45 showing the east skirt of the I-15 SB overpass

The day of the assault and extortion of the cattle, McGuire posted to Facebook numerous times about his involvement in the assault. At 4:22pm, McGuire posted: "Well, for a minute there i thought i was gonna see alot of people die today. But the feds backed down and the cows came home." Another Facebook user responded, "Don't believe for a second that it's over...But keep praying..." McGuire replied: "Its not, but todays battle was beautiful. Proud of nevada and militias." McGuire's post makes clear that he understood the assault to be a coercive action which forced the federal law enforcement officers to abandon the Impoundment Site and the cattle. He also characterizes the confrontation as a "battle."

At 6:23pm, another Facebook user messaged McGuire and asked: "Hey Yo… You alive or what?" McGuire replied, "Yup, i was fighti.g feds in Nevada". Again, McGuire understands himself to be at war with the federal government.

At 9:51pm, McGuire posted: "I need to clear something up for cnn Militia: a military esc group protecting the rights of american citizens. Blm hired contractor: well paid thugs who could care less about americans or laws or the constitution. Glad i could clear that up". Another Facebook user replied, "The media always gets these terms wrong, but it's deliberate so they can place the worst spin on the militia possible…" McGuire responds, "And they are, history was made america can stand up to a tyranical government". McGuire's supposed justification for using force against the federal law enforcement officers executing a court order is a vague and abstract, paranoid-sounding accusation that they were "contractors" trammeling the rights of others. His dehumanization of federal law enforcement officers a shows the he continued to be a threat of danger to the law enforcement community.

McGuire posted a number of pictures of himself at Bundy Ranch to his Facebook page as well, including the following, all posted the day after the assault.







With regard to the above picture, another Facebook user asked if McGuire is in the picture and he responds "I am towards the far end".



With regards to the above picture, another Facebook user inquired if McGuire is on the left in the picture, and McGuire responded: "Are u a gov

agent?"—showing a consciousness of guilt and likely legal ramifications for his illegal actions.

McGuire has never disavowed or expressed regret for his actions at Bundy Ranch. Indeed, he expressed interest in getting involved in another confrontation after the April 12 assault was barely completed. On April 13, 2014, McGuire messaged another Facebook user with the name of a militia organization and offered his assistance:

> My name is SGM Tread from the Arizona State Militia. I am a native of wichita falls Texas. I have just returned from the bundy ranch in nevada where the battle, for the day at least was a great victory. I have heard the BLM is again attacking ranchers land in north texas. I would like to extend an olive branch so to speak and see if you have intell at all. I can be reached at treadasm@countermail.com our website is www.arizonastatemilitia.com.  thank you for your time and God bless.

## II.   ARGUMENT

The Bail Reform Act provides that a judicial officer shall detain a defendant pending trial where "no conditions or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community."   18 U.S.C. § 3142(e).   Detention is appropriate where a defendant poses either a danger to the community or a risk of non-appearance and it is not necessary to prove both.  *See United States v. Motamedi*, 767 F.2d 1403, 1406 (9th Cir. 1985).   The Government must establish by clear and convincing evidence that the defendant presents a danger to the community and by a preponderance of the evidence that the defendant is a risk of non-appearance.  *Id.*

In determining whether pretrial detention is appropriate, Section 3142 provides four factors for the Court to consider: (1) the nature and circumstances of the offense charged, including whether the offense charged is a crime of violence; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger posed by the defendant's release. *United States v. Townsend*, 897 F.2d 989, 994 (9th Cir. 1990); 18 U.S.C. § 3142(g).

Where, as here, there is probable cause to believe that the defendant has committed an offense under Title 18, United States Code, Section 924(c), the court shall presume, subject to rebuttal, that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community.  18 U.S.C. § 3142(e)(3)(B).

At the detention hearing, the Court may properly rely upon a proffer by counsel in determining a defendant's danger to the community or risk of flight. *See United States v. Winsor*, 785 F.2d 755, 756 (9th Cir. 1986) ("'[T]he government may proceed in a detention hearing by proffer or hearsay.").

### A.   The Offenses Charged Are Based on the Defendant's On-Going Defiance of Federal Court Orders and Include Crimes of Violence.

Crimes of violence for purposes of the Bail Reform Act include any offense that has as "an element of the offense the use, attempted use, or threatened use of physical force against the person or property of another," and is a felony that "by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense."  See 18

U.S.C. § 3156(a)(4)(A).   Here, several counts in the Indictment are crimes of violence:  assault on a federal officer with a firearm and deadly weapon; extortion by force and violence; Section 924(c) counts as to each; and conspiracy to commit same.

McGuire's charges are grounded not only in violence and his lawless acts, but also in his complete disregard for the rule of law. McGuire came to Bunkerville for the express purpose of using force against federal law enforcement officer against the United States. He brought a firearm to Nevada for the purpose of threatening and interfering with federal law enforcement officers.   He contributed directly to the escalation of violence in the wash to the point where witnesses say that something as innocent as an engine backfire would have set off a firefight between Bundy's gunmen (which included McGuire) and the officers. Having been present when Cliven Bundy ordered the crowd to go get the cattle, and heading to the wash with firearms immediately upon receiving that command with other gunmen in tow, McGuire was not the least bit confused that he was going to use violence to achieve Bundy's agenda. He took a close position where he was armed with a firearm close to the law enforcement officers, well within their vision, forcing them to abandon the Impoundment Site.

**B.     Substantial Evidence Exists Establishing the Defendant's Guilt.**

In the immediate aftermath of the April 12 assault, federal law enforcement officers were forced to abandon the Impoundment site, precluding them from conducting an immediate investigation.   Out of safety concerns and the need to

deescalate the violence and restore order, the remaining local law enforcement officers – who themselves were outnumbered by Bundy's Followers – allowed the gunmen and the conspirators simply to leave the site without making any arrests, conducting any interviews, taking any statements, or obtaining any identification of the gunmen and other assaulters.

Absent contemporaneous arrests and identifications, the investigation became purely historical in nature.  The presence of many gunmen in and near the area of Bundy Ranch, the armed checkpoints and patrols, the presence of assault weapons in the militia camps, including a .50 caliber machinegun, further increased the difficulty of conducting a physical investigation of Bundy Ranch or the Impoundment Site.

All of that said and despite those obstacles, the investigation began the day after the assault and continues to this day, identifying the assaulters, where they came from, how they got to Nevada, their connections to Bundy and others and their role in the assault and the aftermath.

To date, the government has conducted hundreds of witness interviews; executed dozens of search warrants; reviewed, organized and analyzed hundreds of thousands of pages of documents (mostly from social media); reviewed, organized and analyzed thousands of pages of telephone records; and organized, reviewed and analyzed hundreds of hours of audio and video recordings.

McGuire is captured repeatedly in pictures and video, providing personal security to Bundy (e.g., deterring any possible lawful arrest), traveling to the wash, and taking tactical positions in the wash to assault, intimidate, threaten

and interfere with law enforcement officers while they were executing their duties. One officer observed the assault rifle, likely owned by McGuire's fellow Arizona State Militia member, Woods, being pointed at him from McGuire's general position. McGuire's lawless and dangerous actions up to and during the assault and extortion  are thoroughly documented, nearly step by step, as is his complete lack of remorse and his willingness to commit similar crimes in the future.

### C.  The Defendant's History and Characteristics Demonstrate the Danger and Risk of Non-Appearance He Poses.

Defendant has family and is employed and has a military service record. Yet his willingness to use his force and violence against law enforcement officers while they executed their duties, demonstrates his violent nature and character. His ability to dehumanize the officers and endanger their lives shows his disregard for human life.

### D.  The Defendant Poses A Significant Danger to the Community.

The Defendant's conduct in April of 2014 risked many people's lives – he introduced firearms—working with multiple other gunmen—into to a volatile situation to illegally obtain property. This callousness toward human life and willingness to engage in calculated violence with a complete disregard for the safety of civilians and the rule of law shows that the defendant is a grave danger to his community. Not only does McGuire admit his involvement on social media, he was eagerly seeking out another confrontation a mere day after the assault at Bundy Ranch.

**E.     Only Pretrial Detention Will Reasonably Assure the Safety of Others and the Community and the Defendant's Future Appearance.**

A presumption applies that the Defendant shall be detained, the defendant having been charged with multiple counts under Section 924(c).   18 U.S.C. § 3142(e)(3)(B).   The Defendant cannot overcome that presumption.   The charges, the evidence, the defendant's history and the danger posed establish that there are no conditions or combination of conditions that can address these risks.

Even the most stringent of conditions are insufficient to assure the safety of the community or the appearance of the Defendant given that ultimately, they must rely on the Defendant's good faith compliance.  *See United States v. Hir*, 517 F.3d 1081, 1092 (9th Cir. 2008) (Noting that although the defendant and pretrial services proposed "strict' conditions, "they contain[ed] one critical flaw. In order to be effective, they depend on [the defendant's] good faith compliance."); *see also Tortora*, 922 F.2d 880, 886 (1st Cir. 1990)  (concluding that an extensive set of release conditions contained "an Achilles' heel ... virtually all of them hinge[d] on the defendant's good faith compliance").   In *Tortora*, an alleged member of a prominent mafia family stood trial for crimes under the racketing and organized crime statute.  The First Circuit considered the elaborate conditions proposed that would restrict any communications with the defendant's cohorts.   Ultimately, the court rejected those conditions, recognizing that "the conditions as a whole are flawed in that their success depends largely on the defendant's good faith-or lack of it. They can be too easily circumvented or manipulated." *Tortora*, 922 F.2d at 886.

Such considerations are doubly present here, given that the Defendant's crimes in this case are rooted in his defiance of federal court orders, and that his commitment to flouting federal authority was dramatically and violently demonstrated, with no disavowal or remorse up until the present time.

## CONCLUSION

For the reasons stated herein, McGuire cannot overcome the presumption of detention in this case. Further, the government has shown by clear and convincing evidence that McGuire is a danger to the community and a poses a risk of non-appearance such that no conditions or combination of conditions will reasonably assure the safety of the community or his appearance at future proceedings. Accordingly, the Government respectfully requests that the Court order the Defendant detained pending trial.

DATED this 16th day of March, 2016.


Respectfully Submitted,

DANIEL G. BOGDEN
United States Attorney

/s/
_____
STEVEN W. MYHRE
NICHOLAS D. DICKINSON
Assistant United States Attorneys
NADIA J. AHMED
ERIN M. CREEGAN
Special Assistant United States Attorneys

Attorneys for the United States.